# DISTRIBUTION AGREEMENT

This Distribution Agreement ("*Agreement*") is made and entered into as of the 1 day of January, 2009 (the "*Effective Date*"), by and between Primo Water Corporation ("*Primo*"), a Delaware corporation, and **HOD Enterprises**, a Texas L.P. ("*Distributor*"). Any reference to the "Agreement" shall include the attached Schedules and the Distribution Manual (defined in Section 1 below), all of which shall be deemed incorporated herein by reference.

### Recitals

Whereas, Primo is in the business of procuring, selling and distributing bottled drinking water, and related products and services, to customers throughout the United States (the "*Business*"); and

Whereas, Primo desires that Distributor assist, and Distributor desires to assist, Primo in the Business by acting as Primo's exclusive agent and representative for the Product and the Service within the Territory for the Term.

### Agreement

Now, therefore, for and in consideration of the mutual promises and covenants contained herein and other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. **Appointment.**

    (a) Primo hereby appoints Distributor, and Distributor accepts such appointment, as Primo's exclusive delivery and service agent and representative with respect to a bottled drinking water supply and bottle exchange service (the "*Service*"), in which Distributor will (i) deliver three (3) or five (5) gallon (or other approved size) plastic containers ("*Bottles*") of drinking water produced by or on behalf of Primo (the "*Product*") to the designated and approved retail customers of the Business (the "*Customers*") in the geographic area(s) designated on the attached Schedule A (the "*Territory*"), and (ii) pick up empty Bottles from Customers in the Territory that have been exchanged for full Bottles. Retail Customers are defined as "those customers that re-sell Primo Product to others." Schedule A may also designate approved retail customers outside of the Territory to be serviced by Distributor (the "*Non-Territory Customers*"). Primo may add, terminate or modify its Customer relationships, within or without the Territory, in its sole discretion and may remove any Non-Territory Customer from Schedule A upon thirty (30) days' notice to Distributor. Nothing herein will be interpreted as imposing an obligation upon Primo to purchase from, or to distribute through, Distributor any specific amount or value, or minimum volume, of Product, and Distributor acknowledges and agrees that there is no guarantee of any minimum amount of compensation for Distributor under this Agreement. Distributor further acknowledges and agrees that it (x) is not relying on any information, projections, forecasts, pro-formas or other information provided by Primo or its affiliates; (y) has paid no fee for this appointment and that it has received no franchise rights under this Agreement; and (z) has received a copy of Primo's manual for distributors containing provisions and policies about the Business (as may be amended from time to time in Primo's sole discretion, the "*Distribution Manual*").

    (b) Primo and Distributor may together designate a portion of the Territory as "*Premium Territory*" for a fixed period of time, as set forth on the attached Schedule C. With regard to any Premium Territory, Distributor shall be entitled to the "*Premium Benefits*" set forth on the attached Schedule B during the term of such Premium Territory designation. Upon sixty (60) days' notice to


*Distribution Agreement* — Page 1 — CL000387
Motion to Confirm Exhibit B — Case No. 01-15-0003-2518 — Joint Ex. 44

*Territory*" for a fixed period of time, as set forth on the attached Schedule C. With regard to any Premium Territory, Distributor shall be entitled to the "*Premium Benefits*" set forth on the attached Schedule B during the term of such Premium Territory designation. Upon sixty (60) days' notice to Distributor, Primo may remove all or any portion of the Premium Territory from the "*Premium*" designation, and Distributor shall then have sixty (60) days within which to agree to service the removed Premium Territory as regular Territory under Schedule A or allow Primo to reassign the removed Premium Territory to any other distributor of Primo's choice, or to itself.

(c) Nothing in this Agreement shall limit Primo's right to sell or distribute Product or similar water or other products itself or through other distributors outside of the Territory to consumers other than Non-Territory Customers. In addition, Primo and any of its affiliates and agents may [illegible]

**Term.** This Agreement shall commence on the Effective Date specified above, and shall, unless earlier terminated pursuant to Section 8, continue until its tenth (10th) anniversary ("*Initial Term*"), when it shall be automatically renewed unless terminated pursuant to Section 8 for one or more successive one-year terms (each, a "*Renewal Term*" and collectively with the Initial Term, the "*Term*"), each of which shall be subject to this Agreement.

**Non-Competition; Non-Solicitation; Confidentiality.**

(a) During the Term of this Agreement and for a period of two (2) years after the termination of this Agreement for any reason, Distributor will not directly or indirectly (i) provide bottled-water bottle exchange services on behalf of itself or anyone other than Primo, (ii) compete against Primo by selling or distributing bottled water products in bottle volumes greater than 2.5 gallons to any retailer customer, or (iii) solicit any customer or potential customer of Primo (each such action, "*Compete*") as follows: (A) Distributor shall not Compete with Primo anywhere in the world during the Term of this Agreement; and (B) during the two (2) years after the termination of this Agreement for any reason, Distributor shall not Compete with Primo within the entirety of any state comprising any portion of the Territory, within the entirety of any state contiguous to any such state, or within one hundred (100) miles of any portion of the Territory. Distributor further agrees that it shall not have "underground" accounts within or outside the Territory either for bottled drinking water supply and exchange services not authorized by Primo or for which payment from Customers is not remitted in full to Primo.

(b) Distributor acknowledges that it may have access to various trade secrets and confidential information of Primo, including, but not limited to, materials or records of a proprietary nature, technical data, records and matters relating to research, finance, accounting, sales, profits, markets, market research, personnel, management and operations, manufacturing processes or techniques, customer lists, price lists, specifications, and other information regarding customers and their requirements, costs of providing service, computer systems, programs, files, and other data not generally available to the public (the "*Confidential Information*"). Distributor agrees not to communicate, divulge or use for the benefit of itself, or any other person or entity, any such Confidential Information during the Term of this Agreement and thereafter without the prior express written consent of Primo and shall either destroy or return such Confidential Information to Primo following the termination of this Agreement.

(c) Distributor acknowledges that all covenants, provisions and restrictions contained in this Section 3 are reasonable, appropriate, fair and valid and agrees that any breach of them (i) shall constitute cause for immediate termination of this Agreement and (ii) may not be adequately remedied by monetary damages, so that Primo is hereby authorized and entitled, in addition to all other rights and

2

remedies available to Primo, to apply for and obtain from any court of competent jurisdiction interim and permanent injunctive relief and an accounting of all profits and benefits arising out of such breach.

4. **Purchase Option.** Primo shall have the right, exercisable at any time after the fifth (5th) anniversary of commencement of the Term at Primo's sole option, to purchase all of Distributor's distribution rights under this Agreement or all warehouse leases associated with Distributor's performance of this Agreement, and any or all trucks, trailers, forklifts, and other equipment used, or required to be used, by Distributor exclusively in connection with the performance of its obligations under this Agreement ("*Equipment*"), for an amount equal to the sum of (i) the aggregate Revenue received by Distributor from Primo under this Agreement for the twelve (12) month period ending on the date fifteen (15) days prior to the proposed effective date of such purchase ("*Purchase Date*"), or if this Agreement has not been in effect for a full year, for the period from the Effective Date to the Purchase Date, plus (ii) the fair market value of any Equipment purchased under this provision. For the purposes of this Section 4, "*Revenue*" shall mean the total amount of money received by Distributor from Primo in exchange for the distribution activities required under this Agreement, but not including any sales commissions, installation fees or consulting fees for other services Distributor may provide that are incidental to its distribution activities hereunder. The fair market value of the Equipment shall be mutually agreed upon by the parties. If the parties are unable to agree on fair market value within fifteen (15) days of Primo's providing notice of its exercise of the option hereunder, fair market value shall be determined by the average of two independent third party appraisals, one obtained by the Distributor and one obtained by Primo, provided the values are within 20% of each other. If the two appraisals have a disparity greater than 20%, a third appraisal shall be performed by a mutually agreed upon independent third party. Fair value will then be calculated as the average of the three appraisals. Primo may exercise such option by providing Distributor written notice thereof at least thirty (30) days prior to the proposed Purchase Date. For the avoidance of doubt, the parties acknowledge and agree that Distributor's obligation under Section 3 not to Compete with Primo for two (2) years after termination shall apply to a termination effected through Primo's exercise of the purchase option described in this Section 4. Any assignment made, or subcontract entered into, by Distributor shall include Primo's purchase option under this Section 4, and the assignee or subcontractor shall agree to be bound by this purchase option, with Distributor liable for the failure of any assignee or subcontractor to comply with Primo's purchase option.

5. **Distributor Duties.** Distributor shall discharge and perform all of its duties under this Agreement in strict conformance and accordance with the Distribution Manual, any other instructions provided by Primo from time to time, and all applicable laws and regulations, including those of the U.S. Food and Drug Administration.

6. **Payment to Distributor.** Primo shall pay Distributor for its services hereunder in accordance with the payment rates and schedule on the attached Schedule B, which may be amended by Primo at any time on a commercially reasonable basis, upon giving at least thirty (30) days advance notice thereof to Distributor. Primo shall have the right at all times to set off any amounts due from Distributor to Primo against any amounts otherwise payable by Primo to Distributor (including with respect to hand-held terminals and other expenses as specified in Schedule B). All payments due from Primo to Distributor for services provided in any month shall be disbursed on or before the 15th of the following month (or on the next business day if the 15th falls on a holiday or weekend).

7. **Trademark License.** Primo hereby grants Distributor the non-exclusive right to use the trademarks listed on the attached Schedule D ("*Primo Marks*") within the Territory solely in conjunction

3

CL000389

with Distributor's performance of its duties under, and solely during the Term of, this Agreement. Any and all uses by Distributor of any of the Primo Marks, other than the regular and intended use of Primo Marks contained on or in materials supplied directly by Primo, must be approved in advance in writing by Primo. Distributor shall maintain all Bottles, displays and other articles, property and materials used in conjunction with the Primo Marks and the Service and the Business at a high level of quality and appearance satisfactory to Primo. Primo may inspect Distributor's premises and all such property and materials upon reasonable notice to Distributor. Distributor will not use any of the Primo Marks or the designation "Primo" in any form as a trademark, a trade name, or in its corporate or business name without the prior written approval of Primo, not to exceed the Term of this Agreement. Distributor acknowledges the validity of, and will not contest, any such Marks. Distributor will immediately advise Primo in writing upon learning of any infringement, potential infringement, or misuse of any of the Primo Marks. Distributor shall cease all use of the Primo Marks upon termination of this Agreement.

8. **Termination.** Either party may terminate this Agreement for any reason at the end of the Initial Term or any Renewal Term by giving the other party written notice of termination at least six (6) months prior to the end of the Initial Term or any Renewal Term. Either party may terminate the Agreement immediately upon the occurrence of: (i) a material breach of this Agreement by the other party that remains uncured thirty (30) days after receiving notice from the other party specifying the breach; (ii) an assignment for the benefit of creditors by either party; (iii) the institution of bankruptcy, reorganization, liquidation or receivership proceedings by or against either party; or (iv) the insolvency of either party. Following any termination, the parties shall settle all payments due, and Distributor shall return all of Primo's property, within thirty (30) days, and Distributor shall cooperate with Primo in obtaining (including transfer of, if permitted) all permits and authorizations necessary for Primo to continue the Business in the Territory.

9. **Severability.** The provisions of this Agreement shall be severable, and the invalidity or unenforceability of any provisions hereof shall not affect the validity or enforceability of the remaining provisions.

10. **Assignment.** This Agreement shall be binding upon, and inure to the benefit of, the parties hereto and their successors and assigns: *provided, however,* that Distributor's rights and obligations hereunder shall not be assigned, transferred or subcontracted, in whole or in part, directly or indirectly, whether by Distributor, by operation of law, or otherwise, to any person, company, firm, or corporation, without the prior written consent of Primo, which shall not be unreasonably withheld. Any such assignment or subcontract shall be subject to the provisions of this Agreement, and shall be documented in a written agreement that shall include without limitation Primo's purchase option under Section 4, and shall further include the following provision:

> The assignee, subcontractor or party receiving distribution rights under this agreement acknowledges that it (i) has received a copy of the Distribution Agreement, dated as of _____, between Primo Water Corporation and the party that is assigning, subcontracting or otherwise transferring its rights and obligations thereunder pursuant to this agreement; (ii) agrees to be bound by Primo Water Corporation's purchase option set forth in Section 4 of such Distribution Agreement, whereby Primo Water Corporation may repurchase all of the distribution rights being transferred under this agreement pursuant to the terms set forth in Section 4 of such Distribution Agreement, and (iii) shall have no rights to payment from, or other claims with respect to, Primo Water Corporation in connection with its exercise of such purchase option.

4

**CL000390**

11. **Claims and Indemnity.** Either party shall protect, defend, indemnify and hold the other party harmless from and against any and all loss, verdict, award, settlement, claim, cost or expense whatsoever, including without limitation personal injuries, property damages or economic losses, as well as any other damages of any nature whatsoever, including compensatory, special, consequential, punitive or exemplary damages, attorneys' fees and disbursements, with respect to third party claims arising from the first party's misfeasance, negligence, or failure to meet any of its obligations in this Agreement. ▇▇▇▇▇ hall have the right to defend any claim or action for or in which the other party seeks indemnification. ▇▇

12. **Independent Contractors.** It is the intention of the parties that the relationship existing between them shall be that of independent contractors; that nothing herein contained or done pursuant hereto shall constitute Distributor a general agent of Primo for any purpose whatever; and that all things done and to be done by Distributor pursuant to the provisions hereof or done by Distributor in anticipation of this Agreement, unless expressly otherwise provided herein, shall be at Distributor's own cost and expense.

13. **Governing Law.** This Agreement shall be governed by and construed in accordance with the laws of the State of North Carolina, without regard to its laws and decisions relating to conflicts of laws.

14. **Dispute Resolution.** Any dispute or disagreement involving or including Primo and which pertains to or arises out of this Agreement or the Business shall be settled by non-binding mediation to be conducted in Winston-Salem, North Carolina by a mediator selected jointly by the parties or, in the absence of agreement on mediator selection, by a mediator appointed by the American Arbitration Association in accordance with its rules and provisions pertaining to non-binding mediation in commercial disputes. Except for the parties' own expenses, including legal fees, which shall be borne individually, the parties shall jointly share the costs and expenses of such mediator. If such mediation fails to resolve such dispute or disagreement, then the dispute or disagreement shall be settled by arbitration to be held in Winston Salem, North Carolina, in accordance with the rules of the American Arbitration Association, or its successor. The decision of the arbitrator shall be conclusive and binding on the parties to the arbitration. The prevailing party in any arbitration shall be entitled to recover from the other party or parties, the costs and expenses of maintaining such arbitration, including reasonable attorney's fees and costs incurred before such arbitration is commenced, during arbitration and on appeal.

15. **Entire Agreement; Amendment.** This Agreement constitutes the entire agreement between the parties and supersedes any and all prior agreements and understandings between them relating to this subject matter. Except as otherwise provided herein, this Agreement may be amended or changed only by an instrument in writing signed by both parties.

16. **Notices.** Any notices required hereunder shall be sent by fax or e-mail, followed by "hard copy" first class mail, as follows:

| To Primo: | To Distributor: |
|---|---|
| Primo Water Corporation | _____ |
| 101 N. Cherry Street, Suite 700 | _____ |
| Winston-Salem, NC 27101 | _____ |

17. **Non-waiver.** The election or failure by either party hereto to forego or not exercise any right hereunder shall not constitute a waiver of any other right or obligation hereunder.

5

CL000391

Primo Water Corporation  
("Primo")

By: /s/ [signature]

Title: Vice President

HOD Enterprises, L-P.  
("Distributor")

By: /s/ John C. Cooke

Title: General Partner

6

CL000392

## LIST OF EXHIBITS TO DISTRIBUTION AGREEMENT

| | |
|---|---|
| Schedule A | Territory & Customers |
| Schedule B | Distributor Compensation Schedule |
| Schedule C | Premium Territory |
| Schedule D | Primo Marks |

7

CL000393

## SCHEDULE A – Territory and Customers

**"Territory":**

| County | Sta | Country/Regi |
|---|---|---|
| Houston | Tex | United States |
| Leon | Tex | United States |
| Robertson | Tex | United States |
| Brazos | Tex | United States |
| Madison | Tex | United States |
| Walker | Tex | United States |
| Trinity | Tex | United States |
| Polk | Tex | United States |
| Jasper | Tex | United States |
| Tyler | Tex | United States |
| Liberty | Tex | United States |
| San Jacinto | Tex | United States |
| Montgome | Tex | United States |
| Grimes | Tex | United States |
| Burleson | Tex | United States |
| Washingto | Tex | United States |
| Waller | Tex | United States |
| Fort Bend | Tex | United States |
| Austin | Tex | United States |
| Colorado | Tex | United States |
| Jackson | Tex | United States |
| Wharton | Tex | United States |
| Harris | Tex | United States |
| Hardin | Tex | United States |
| Orange | Tex | United States |
| Jefferson | Tex | United States |
| Chambers | Tex | United States |
| Brazoria | Tex | United States |
| Matagorda | Tex | United States |
| Galveston | Tex | United States |

8

CL000394

Case 1:17-cv-00304-CCE-JEP   Document 1-2   Filed 04/03/17   Page 8 of 14

Map of territory with existing locations as of 5/23/2008



9

CL000395

## SCHEDULE B – Distributor Compensation Schedule

**Regular Commission Schedule**

**Effective Date: August 14, 2008**

**Base Transaction Payment:**
Effective the above date, the amount due to Distributor per Bottle delivered to each Retail Location.

### TRANSACTION AT THE RETAILER

5 Gallon Bottle: $3.35
3 Gallon Bottle: $3.10

**The standard transaction payments will be adjusted the month following two consecutive months of total bottles delivered within the territory:**

**12,000 bottles**
5 Gallon Bottle: $3.25
3 Gallon Bottle: $3.00

**20,000 bottles**
5 Gallon Bottle: $3.15
3 Gallon Bottle: $2.90

**35,000 bottles**
5 Gallon Bottle: $3.00
3 Gallon Bottle: $2.75

(C) Payments to Distributor will have the following <u>deductions</u> (if applicable):

Monthly lease fees for hand-held terminals as set forth in the Distribution Manual.
Any other applicable expenses allocated to the Distributor by Primo under the Distribution Manual.
Any charge-back fees as defined in the Distributor Manual.

(D) Customer Installation Cost: $ 100.00 per location, for the initial set up of displays and return bin at retailer locations in a manner satisfactory to Primo and retailer.

**Premium Commission**

Additional premium compensation amounts, negotiated and agreed upon by the parties per Bottle delivered, for service by the Distributor of retail locations in the Premium Territory set forth

11

CL000396

**Schedule C.**

<u>**Effective Dates: August 14, 2008**</u>

<u>**Premium Transaction Payment:**</u>

**Premium over Base Transaction Payment***

    5 Gallon Bottle: $0.50
    3 Gallon Bottle: $0.50

All commissions, compensation and expenses set forth per this Schedule, including regular and premium, are subject to change by Primo in accordance with Section 6 of this Agreement.

12

CL000397

**Non-Territory Customers:**

10

CL000398

## SCHEDULE C – PREMIUM TERRITORY

**The following counties in the state of Texas:**
- Houston
- Leon
- Robertson
- Brazos
- Madison
- Walker
- Trinity
- Polk
- Jasper
- Tyler
- Grimes
- Washington
- Austin
- Colorado
- Jackson
- Wharton
- Hardin
- Orange
- Jefferson
- Matagorda

13

CL000399

Case 1:17-cv-00304-CCE-JEP   Document 1-2   Filed 04/03/17   Page 13 of 14

## SCHEDULE D – Primo Marks

The PRIMO name and logo, including bubble design

14

CL000400