ARTESIA SPRINGS LLC, and
HOD Enterprises LP, Claimants,
Represented by Craig Caton & James PC

v.

DS SERVICES OF AMERICA, INC.
and PRIMO WATER CORPORATION,
Respondents, Represented by Troutman Sanders LLP

# AWARD of ARBITRATORS

PRIMO WATER CORPORATION, Counter-Claimant,
Represented by Troutman Sanders LLP

v.

ARTESIA SPRINGS, LLC, HOD
ENTERPRISES, L.P., AND JOHN
C. COOKE, Counter-Respondents,
Represented by Craig Caton & James PC

1.  <u>Jurisdiction.</u> The undersigned arbitrators were designated, by the parties in accordance with the parties' arbitration agreements following an order compelling arbitration. The Commercial Rules of the American Arbitration Association are applicable to this matter.

2.  Having been duly sworn, the undersigned arbitrators heard the proofs and allegations of the parties on January 8 to 13, 2017 at 101 N. Cherry Street in Winston Salem, North Carolina. The Parties have completed presentation of their proofs and evidence, and the evidentiary record is closed. The arbitrators hereby FIND as follows:

## PRELIMINARY FINDINGS

3.  <u>Parties.</u> Claimants Artesia Springs LLC ("Artesia") and HOD Enterprises LP ("HODE") are Texas companies located in San Antonio, Texas. Respondent Primo Water Corporation ("Primo") is a Delaware corporation located in Winston-Salem, N.C. Respondent DS Services of America, Inc.

("DS") is a Delaware corporation located in Atlanta, Georgia.  Counter-respondent John C. Cooke ("Cooke") is the owner of HODE.[1]

4.  Primo is in the "business of procuring, selling and distributing bottled water and related products and services... including 3 and 5-gallon pre-packaged bottle water exchange services."  See **Ex. 104**, Strategic Alliance Agreement with DS ("DS Agreement") p.1.  See also Joint Stipulations ("Stips").

5.  DS is in the business of producing, selling and distributing bottled water and other products and services.  **Ex. 104**, DS Agreement p. 1.  It operates at the national level.

6.  Artesia and HODE are regional distributors ("ROs") operating solely in the South Texas area.  Artesia and HODE were distributors for Primo prior to Primo's execution of the DS Agreement.

7.  <u>Nature of Dispute.</u>  This dispute arose after Primo entered into the DS Agreement pursuant to which DS became "Primo's primary bottler and distributor of the Products and provider of Services within the Territory during the Term."  **Ex. 104**, DS Agreement p. 1.   The Territory was defined as the Continental United States.

8.  <u>Other Proceedings</u>.  On August 8, 2014, Artesia, HODE and BBB Water, Inc., all Primo Distributors at the time, filed suit against Primo and DS in the District Court of Bexar County, Texas, seeking "...non-monetary and monetary relief within the jurisdictional limits of the Court in excess of $1,000,000."  **Ex 302** Complaint 8/8/14.   The matter was removed to federal court (Case no.5:14 CV 00791 W. D. Texas) which by order dated January 31, 2015 (See Docket at Document 41) compelled this arbitration and otherwise dismissed the claims without prejudice in favor of arbitration.

9.  <u>Cooke's Agreements.</u>   Cooke' s company HODE had several agreements with Primo.  On August 14, 2008, HODE executed a Distribution Agreement ("HODE DA") with Primo (**Ex. 41**), the effective date of which was later agreed to be January 9, 2009.  Tr. p. 311-312; 327.  The HODE DA was amended several times to effectuate price cuts by executed amendments or addenda dated August 1, 2011 (**Ex 72**), November 21, 2011 (**Ex 75**) and February 20, 2013 (**Ex. 91**).

10.  By letter dated December 6, 2013, Primo unilaterally implemented a price cut per bottle to $2.59 but did not ask HODE to consent by addendum as it

---

[1] BBB (sometimes referred to as 3B) Water was a party to this matter at one time. On February 3, 2016, the parties notified the AAA that BBB had settled and requested that it be dismissed by consent.  The AAA granted the request.

had in the past. **Ex. 128**. In the same letter, Primo offered HODE the option to early terminate its DA with Primo, an option that HODE declined. **Ex. 128**. Primo later purported to terminate the HODE DA for cause by letter dated September 5, 2014. **Ex. 322**.

11.   HODE and Primo also executed a Trademark Agreement dated August 14, 2008 (**Ex. 67**) pursuant to which HODE could use certain Primo intellectual property in the separate home and office delivery business that HODE hoped to develop. Tr. pp. 310; 328; 331-332. Primo also purported to terminate the Trademark Agreement by letter dated September 5, 2014. **Ex. 323**.

12.   HODE and Primo also executed a Bottled Water Supply Agreement dated August 14, 2008. **Ex. 40**. Tr. p. 326. There is no evidence that Primo ever attempted to terminate that agreement.

13.   <u>Ramon's Agreement</u>. Artesia, which is owned by Rudy Ramon ("Ramon") executed only one written agreement with Primo, a Distribution Agreement executed on January 1, 2008.[2] **Ex. 34**. Artesia and Primo executed an amendment on January 13, 2009 (**Ex. 46**) and two addenda dated November 21, 2011 (**Ex. 76**) and April 18, 2012 (**Ex. 85**).

14.   As with HODE, by letter dated December 6, 2013 Primo unilaterally implemented a price cut to $2.59 per bottle but did not ask Artesia to consent by addendum as it had in the past. **Ex. 129**. In the same letter, Primo offered Artesia the option to early terminate its DA with Primo, an option that Artesia declined. **Ex. 129**. Primo later purported to terminate the Artesia DA for cause by letter dated September 5, 2014. **Ex. 321**.

15.   <u>Attorneys' Fees</u>. Primo now argues that neither party is entitled to attorneys' fees on the basis that contractual provisions in the original DAs it drafted were executed by the parties prior to October 1, 2011, the effective date for legislation in North Carolina making such provisions effective. See Primo's 2/24/17 Response at p. 32 footnote 15.

16.   This argument overlooks the fact that both DAs were amended several times after the effective date of the N.C. legislation. In each case, the addenda or amendment, drafted by Primo and executed by Claimants, states that it is "subject to the terms of the Agreement" and "except as modified hereby the Agreement remains unmodified and in full force and effect." See e.g. **Ex. 75**

---

[2] Artesia, however, also bottled water per Primo's "recipe" like HODE, but this agreement was apparently never reduced to writing.

**and 76.** Accordingly, the party prevailing on the contract claims will be entitled to an award of attorneys' fees based on the contractual provision.

17. Claims alleged by Claimants. In their Third Amended Demand dated December 11, 2015, Claimants alleged: (A) breach of the respective Distributorship Agreements by Primo; (B) tortious interference with prospective business relationship and with contract against DS; and (C) fraud and conspiracy to commit fraud against Primo and DS. In their Supplemental Demand for Arbitration dated April 14, 2016, Claimants added a fourth claim against Primo and DS for (D) violations of NCGS 75-1.1 by Primo and DS.

18. Counterclaims alleged by Respondents. In their Answer and Counterclaims dated November 20, 2015, Respondents alleged: (A) breach of the Distributorship Agreement by Artesia; (B) breach of the HODE Distributorship Agreement by HODE and Cooke; (C) unfair competition and violations of NCGS75-1.1 and the comparable Texas statute by HODE and Cooke; (D) violations of the Lanham Act (15 USC Sec. 1114 and 1125) by HODE and Cooke; and (E) violations of the Anti-cybersquatting Act (15 USC Sec. 1225 (d)) by HODE and Cooke.

19. Prior Rulings. By Order dated September 9, 2015, the Panel permitted the joinder of HOD Enterprises LP and BBB Water, Inc. as Claimants in this matter. As noted below, BBB was removed as a party by the AAA following the February 3, 2016 consent request of all parties. As a result, this Award does not address any claims raised by BBB or counterclaims raised against it by the Respondents.

20. By Order dated July 18, 2016, the Panel ruled on Respondents' Motion for Partial Summary Judgment dated April 9, 2016. The Panel denied the motion with the exception of the request to dismiss Claimants' request for declaratory judgment relating to the enforceability of covenants not to compete contained in the Distribution Agreements. All parties agreed that the request for declaratory judgment had become moot during the pendency of the arbitration and that claim was dismissed.

21. Primo. Primo was formed in October 2004 by Billy Prim ("Prim"). Prim had successfully founded, grown and sold a propane gas distribution company called Blue Rhino. Tr. pp. 1028-1029. Primo went public in 2010. Tr. p. 1043.

22. Primo's business plan was to develop a branded water product and market it to large national retail chains such as Kroger and Wal-Mart similar to the

propane gas distribution business Prim had developed at Blue Rhino. Tr. pp. 1029, 1035, 1037.

23.     As several witnesses testified, Primo did not intend to be in the water distribution business itself; instead, it intended to contract with third party distributors. Tr. pp. 1037-1038, 1076-1077. Initially, national distributors like DS were not interested in doing business with Primo so Primo turned to smaller local and regional distributors, such as Claimants HODE and Artesia. Gunter Depo. pp.24, 27. The quality of the distributors' performance was important to Primo's ability to achieve its long-term goal of acquiring and maintaining national retail accounts. Tr. pp. 978.

24.     Three segments of the water business were described during testimony. The **"Exchange Business"** was defined as bottling and delivering bottles full of water to retail establishments and picking up empty bottles. Tr. p. 21-24; Gunter Depo. p. 139.   The customer would purchase an already filled bottle and get credit for an empty one if the customer had an empty bottle to return. The **"Refill Business"** was described as merchandising empty bottles to retailers and sanitizing and doing maintenance on water filtration in the retail store where customers would bring their empty bottles and refill them on site at the retail store. Tr. p. 24-26; Gunter Depo. 139-140. The **"HOD Business'"** was described as bottling and delivering full bottles of water directly to home and office locations and picking up the empty bottles. Tr. pp.39-40; Gunter Depo. p. 152.

25.     Primo's focus was on the Exchange and Refill Businesses, not the HOD Business. Tr. pp. 307.

26.     <u>Role of Artesia and HODE</u>. Both Ramon of Artesia and Cooke of HODE had experience in the water business prior to contracting to be distributors for Primo.  Ramon had been bottling water from Artesia Springs, a natural source, and was in the HOD Business. Tr. pp. 10-17.  Cooke, who has a degree in chemical engineering, became familiar with the water business through Ozarka Water and later through his company, Steelhead, which developed and manufactured equipment for the bottled water business.  Tr. pp. 285-287; 289; 293-295.

27.     Following execution of their Distribution Agreements in 2008, Ramon and Cooke, whose companies collectively covered most of South Texas for Primo, installed necessary equipment and serviced locations for national retailers located within their territories under contract with Primo.  Tr. pp. 17-28.

Case 1:17-cv-00304-CCE-JEP   Document 1-3   Filed 04/03/17   Page 5 of 32

28. Cooke also began negotiating an agreement with Primo to use its brand and label in the HOD business. Tr. p. 306; 309-310; 324.

29. Cooke and Ramon as well as other distributors played a key role in the development of Primo's brand. For example, Ramon described his significant and successful efforts on behalf of Primo to convince HEB, a large Texas grocery chain, to contract with Primo, efforts for which he was not directly compensated. Tr. pp. 31-32; 41-46; 49-51.

30. Ramon testified that he "took his eye" off growing his other water business in order to help Primo grow its lines of business, without direct compensation, based on Primo's promises of future returns. Tr. pp. 51-52.

31. **Exhibit 34**, Artesia's Distribution Agreement with Primo, confirms the expected role of the distributor in growing Primo's business. Paragraph 5(c) specifically obligates the distributor to set up new accounts for Primo and provides that the distributor shall do so at its own expense.

32. As Primo obtained new contracts with South Texas area companies, including HEB, WalMart, and Brookshire, Ramon was also engaged to do work and training, both within and outside his designated territory, replacing Primo teams previously sent from North Carolina. Tr. pp. 56-57; 69. Ramon even made a training video specifically for HEB. Tr. p. 70.

33. As the business expanded, Ramon purchased and leased equipment, obtained additional space and hired personnel specifically to permit him to meet his obligations with Primo. He set up his leases to run concurrently with his Primo DA, i.e. through January 1, 2018. Tr. p. 64; 72.

34. Both Cooke and Ramon, as well as other distributors deposed in this matter, described their understanding that Prim expected to duplicate his Blue Rhino success with Primo, including an eventual sale of Primo that would financially benefit the distributors.[3] Tr. pp. 28-33; Regan Depo. p. 33,50.

35. Cooke and Ramon understood that they had a long-term contract to distribute, terminable for limited causes, but also terminable without cause for a price to be determined by a specific buyout formula contained in their Distribution Agreements. **Ex. 34** at par.2(d) and **Ex. 41** at par. 4. Both Cooke and Ramon testified that Primo led them to believe that in the event of a termination without cause, they would be paid in accordance with the

---

[3] Specific evidence of how the distributors would benefit from a sale of Primo was never presented, and the Panel found such promises specious at best, as there is no contractual or legal obligation that Primo provide the distributors with financial remuneration of any kind in the event of a sale of Primo.

buyout formula in the DAs. Tr. p. 76 -79; see also testimony of David Brewton (3B), Tr. at pp. 716-718.

36.  Cooke and Ramon each described their understanding, based on conversations with Primo employees, that Primo regarded them and their success as distributors as critical to Primo's success in building its brand. See Tr. pp. 976-977; Regan Depo. p. 25, 47-48. Prim, CEO of Primo testified that they were considered to be Primo's distribution partners. See Prim Deposition (3/9/16) at 17-19 (Gunter picked ROs that could be "partners" with Primo.)

37.  Primo employees with whom distributors dealt characterized the distributor's uncompensated efforts to build the Primo brand as "sweat equity" that would pay off farther down the road when Primo went national or was sold.[4] Regan Depo. p. 65-67.

38.  Primo's 2014 10K filing acknowledged its reliance on its distributors to invest in the assets necessary to establish a proper distribution network, stating: "Our business model allows us to efficiently offer our solutions to our retail partners and centrally manage our bottling distribution network without a substantial capital investment." **Ex. 13** at p. 7. Tr. p. 1077.

39.  Each Distribution Agreement also contained a clause permitting Primo to unilaterally adjust the price paid to the distributor so long as the new price was "commercially reasonable." The pricing for Cooke's and Ramon's Distribution Agreements was amended on several occasions when the parties mutually executed addenda reflecting that pricing change. **Exs. 72, 75, 91, 46, 76, 85.**

40.  Primo's Strategic Alliance with DS. Primo entered into a Strategic Alliance Agreement with DS effective November 12, 2013, pursuant to which DS was to become "Primo's primary bottler and distributor" across the country. This agreement provided Primo with significant financial incentives to eliminate its existing distributors, such as Artesia and HODE and transition their business to DS by December 31, 2015. **Ex. 104.** Tr. p. 92; 1057-1059.

41.  Specifically, paragraph 2(b)(iv) of the DS agreement provided that "Primo covenants and agrees that it will provide DS with Service rights with respect to no less than ninety per cent (90%) of the annual volume of Products in connection with the Business (the "Volume Requirement") no later than December 31, 2015." Pursuant to paragraphs 3 and 4 of Schedule E of the

---

[4] See Note 3, *supra.*

DS Agreement, Primo's failure to deliver 90% of volume to DS by December 31, 2015 would result in Primo becoming obligated to pay DS significantly higher prices for Product delivered by DS. **Ex. 104.**

42. In addition, the faster Primo eliminated its existing distributors, the faster it could improve its margins. Tr. p. 1135.

43. After the execution of the DS Agreement, Primo changed its approach to its "partnership" like relationship with its distributors, including Cooke and Ramon, an approach, which had induced Cooke and Ramon to sign on in the first place. Tr. pp. 719; 727-728; 747.

44. "Transitioning" Distributors. Management at Primo was immediately focused on transitioning business to DS and causing a sufficient number of its distributors to early terminate in order to avoid the additional cost to Primo should the 90% goal not be obtained in a timely fashion. Tr. p. 1081. Primo was hoping to transition 90% to DS by January 2014. Tr. p. 1135.[5]

45. Primo and DS developed a schedule for phasing out Primo's distributors and transitioning to DS. See Tr. p. 1134 ("our external public plan of the conversion [to DS] taking two years" was "very different" from Primo's internal plan.)

46. Primo expected and wanted its distributors to opt to terminate their agreements well in advance of the date in the DS SA because Primo would enjoy considerable savings, as described by Mark Castaneda, CFO of Primo. Tr. 1135.

47. The day after the DS Agreement was executed, November 14, 2013, Primo held a conference call with its distributors. **Ex.109.**

48. Primo assured its dealers that "all current distributor agreements will remain valid." **Ex. 109.** Primo also notified the distributors that unless they were willing to agree to transition their territory to DS "on a transition schedule ahead of your current contract's expiration," they would "continue to operate with Primo at **market pricing** through expiration of your contract at which time the region would be transitioned to DS." **Ex.109** (emphasis added). Primo also mentioned the possibility of a transition incentive consisting of Primo stock of a value to be determined using "volume and tenure." **Ex. 109.**

---

[5]. In fact, Primo's CFO testified that Primo incurred $700,000 in additional costs between May of 2014 and October 2014, the month Primo finally achieved the 90% goal by terminating Claimants. Tr. p. 1135

49. Finally, Primo assured the distributors that their refill business would not be impacted. **Ex. 109**. A series of calls and meetings with individual distributors was planned. See **Exs. 112,118, 119, 124** and **129**; Tr. p. 94.

50. Two days after the execution of the DS Agreement, Mary Leonard, a senior vice president of Primo, circulated a timeline for the DS transition. **Ex. 108**. The timeline includes the task: "develop accelerated transition plan process should a Primo Regional Operator opt out sooner than scheduled." **Ex. 108**.

51. Primo's intent to eliminate its distributors and transition to DS as soon as possible was apparent from presentations it directed at specific distributors. For example, **Ex.124**, a November 2013 power point presentation directed at Artesia, stated that Primo "**would like to transition all regions to DS Waters during the first half of the year.**" Emphasis supplied. At the same time, Primo stated that it would honor the term of Artesia's DA but only at new, lower pricing that it was imposing on all distributors who did not elect to accept the early termination option and transition to DS.

52. By November 27, 2013, things were not going according to Primo's expectations. See. **Ex. 119**. Roman Roman, Primo's Director of Operations, reported to senior management that the situation was "interesting and complex." **Ex. 119**.

53. On December 1, 2013, Prim communicated with his management team stating "I'm trying to figure out a way to get to 90% as quick as possible.... I know this is not playing out the way I described." **Ex. 127**; Tr. p. 1082-1083.

54. On December 5, 2013, Rudy Ramon of Artesia was identified by David Bunn and Roman Roman, Primo employees, as the "RO" (distributor or regional operator) whom they believed was urging distributors to band together to fight the transition to DS. **Ex. 130**.

55. In letters sent in early December 2013, Primo set out the specifics of the distributors' options and gave its remaining distributors ten days to accept the terms. Tr. p. 96; **Exs. 129, 131**.

56. **Option 1** was to early terminate in exchange for a one time "incentive" consisting of Primo stock. In Cooke's case, it was valued at $26,427 (**Ex.131**); in Ramon's case, it was valued at $47,272. **Ex.129**. In both cases, this incentive was less than the figure Primo had agreed to pay in order to early terminate these distributors without cause under the DAs. See Tr. p. 721-722.

57. According to Billy Prim, CEO of Primo, Primo did not exercise its right to early terminate its distributors without cause, as provided in the DAs because it was too expensive for Primo. See Tr. pp. 1070-1072 (Primo did not "have that kind of money"); 1091-1092.

58. Prim testified that, on the other hand, Primo had the money for Option 1. Tr. p. 1082.

59. **Option 2** permitted the distributor to continue as a distributor to the end of its term but at a significantly lower price per bottle.[6] See. **Ex.129 and 131**. In the event a distributor elected Option 2, i.e. to continue to the end of his term, Primo also gave notice of its intent to terminate the agreements at the end of that term, eliminating any prospect for renewal. **Exs. 129, 131**. See also Tr. pp. 721-724.

60. Primo significantly and unilaterally lowered the prices being paid to its distributors who did not accept Option 1. Specifically, it cut prices across the board to $2.59 per five-gallon bottle[7] regardless of the distributor's location. Tr. p. 96. These prices were not applicable to Primo's new national level distributor, DS.

61. Immediately prior to this unilateral price reduction, Artesia's average price per bottle had been $3.20 and Cooke's $3.12. Tr. p. 99 -101. The new price was well below the prices in the South Texas territory in which they operated.[8] See Tr. pp. 752-753. Primo did not seek their consent to this pricing change, as it had with previous pricing adjustments, and it was not presented as negotiable.

62. A substantial number of Primo's distributors ultimately quit or took the discounted buyout proposed in December 2013 because, they said, the price cut imposed by Primo meant they could no longer make a living. Tr. pp. 721-724.

63. One distributor who quit was Gordon Regan ("**Regan**"). Regan assisted Prim at Primo in its early days, specifically in regards to developing the network of distributors. Regan Depo. p. 33. Regan later put together a

---

[6] The "market price" stated in Ex. 109.

[7] *Id.*

[8] The $2.59 per bottle price was the price every Distributor of Primo was told it would receive if it opted not to take the early termination option, a significant per bottle price reduction for Primo Distributors throughout the country. Conversely, DS entered into several sub-distributor agreements after the SAA wherein it agreed to pay sub-distributors per bottle delivery prices ranging from $3.15 to $3.75 (and in some cases $4.00 or more). See Exs. 260, **265, 270 and 356.**

group of investors to purchase Tiger Distribution, and he became a distributor for Primo. Regan Depo. p. 40.

64. After receipt of the December 2013 option letter (**Exs. 129, 131**), Tiger and Regan abruptly quit the business because of the pricing change. Regan testified that he and the investors in Tiger unanimously concluded Tiger could not continue to do business at the $2.59 rate, and told Primo that they "can't live with that." Regan Depo. p. 61-62, 85,102. Despite written notice from Primo that Tiger was in violation of its DA, Tiger received a cash payment to terminate its DA from Primo pursuant to a confidential settlement agreement. Regan Depo. p. 102, 85-87.

65. Ramon was immediately concerned about the DS agreement and Primo's efforts to implement it. On December 9, 2013, Ramon responded to an email from Roman congratulating Ramon for Artesia's top scores as follows: "does it really matter anymore? .... it goes without saying how disappointed Patty and I are in Primo, many families will be out of work and many businesses will be filing for bankruptcy." **Ex. 132.**

66. Ramon also questioned the $2.59 price cut, pointing out that Primo's prices at Walmart were $4.18, at Office Depot $4.95 and HEB $4.00. **Ex. 134.** He asked Primo to describe the competition that warranted the price cut. **Ex. 134.** Primo never did.

67. Instead, Mark Castaneda, the Primo CFO, cited the DS Agreement: Primo "may have to pay penalties" if it is unable to allow DS to distribute "a certain percentage of Primo's exchange volume by 2015." Then he added, without offering any data: "Primo had not been profitable in the exchange business since inception and Primo needed to find ways to reduce costs in order to achieve profitability and lowering distribution costs was required." **Ex. 134.** Neither "reason" constituted a "commercially reasonable" basis for the price cut to $2.59.

68. Primo never offered market studies or analyses to justify the commercial reasonableness of $2.59 for Cooke or Ramon specifically, or on a more general commercial basis. Indeed, Primo's expert, Mr. Lioy, testified that he only considered the issues of "commercially reasonable" from the point of view of Primo. Tr. pp. 943-944.

69. Cooke and Ramon both said that they expected the $2.59 price to eventually put them out of business.

70. Ramon testified that although $2.59 was below his cost, he felt compelled to continue with Primo due to the significant fixed costs he was obligated for as a direct result of the investments he had made in order to service the Primo business and perform his obligations under the DA. Tr. 104, 108.

71. On December 10, 2013, Ramon told Primo that subcontractors he was using in certain areas of his territory would not continue delivering at the $2.59 level. **Ex. 133**. Primo's response reflects the disappearance of the previous cooperative spirit. Primo essentially said: too bad. Ramon was told that unless he early terminated, Ramon was "responsible for maintaining your territory as it is now." **Ex. 133**.

72. Neither Primo's pricing chart prepared by its CFO (**Ex. 15**), nor its expert report and testimony presented at the hearing convincingly demonstrated that Primo's price reduction to $2.59 per bottle was commercially reasonable. Tr. pp. 924-925.

73. DS had economy of scale as a nationwide distributor, unlike regional distributors Artesia and HODE. In justifying the $2.59 price, Primo used selective criteria. For example, Primo used only the base price Primo was paying to DS for existing Primo customers. The higher prices DS was to receive for other categories of customers was not considered.[9] Additionally, Primo did not account for the fact that DS received additional consideration, i.e., Primo stock purchase warrants said to be valued at $600,000.00. Tr. pp. 1111-1112; 1132-1133. Primo's CFO's testimony that the value of the warrants was effectively zero was not credible. Tr. pp. 942-955; 974-977.

74. Most significantly, Primo presented no data to support its contention to its distributors (See **Ex. 124**) that pricing pressures from its customers required that Primo cut its prices to its distributors to $2.59. In short, the justification for the price cut was not justified by any data demonstrating market pressures faced by Primo from its customers. Accordingly, the Panel concludes that the $2.59 price was not commercially reasonable.

75. Ramon testified that despite the significant price cut and other pressures placed on him by Primo following the DS Agreement, he never stopped working to perform his obligations under his DA. Tr. p. 109.

76. Primo's December 6, 2013 "options" did not result in the decision of a sufficient number of distributors to early terminate as it had hoped.

---

[9] Another factor not considered was the annual, automatic adjustment to DS' base price based on the U.S. average diesel price per gallon, and the Consumer Price Index. Tr. pp.1155-1177.

77.　In a series of emails exchanged on December 17, 2013, Primo personnel noted that 45% of the distributors had not responded. Mr. Roman noted in particular that "all of Texas did not respond which is my largest operating area in the SE." **Ex. 136**. This included Artesia and HODE.

78.　Primo's intent to find a way to force Ramon and Cooke to quit or, failing that, to concoct a purported basis to terminate Artesia and HODE for cause is readily apparent from a review of the contemporaneous internal Primo documents, some of which are summarized below.

79.　On December 25, 2013, Billy Prim, CEO of Primo, expressed his concerns that numerous distributors, including Artesia and HODE, had not agreed to a transition plan under Option 1. **Ex. 140**.

80.　As of the end of 2013, Cooke, Ramon and a third Texas distributor, 3B, had not agreed to Option 1. All three had excellent distributor performance scorecard rankings, exceeding 100%. See **Ex.143** (2/3/14). Without their termination, Primo could not achieve the 90% goal.

81.　By January 14, 2014, Primo remained short of the goal (**Ex. 149**) Primo at 84.1%) and Primo management began to develop distributor specific strategies to induce early termination or create a purported basis for termination for cause, either of which would enable Primo to achieve the 90% goal. **Ex. 149; Ex. 151**.

82.　For example, Primo told Ramon that it was considering moving to company operated areas (**Ex. 162**) and told him that refill would be transitioned (**Ex. 167**) despite the earlier assurances that refill would not be affected by the DS deal. **Ex. 109**, and discussion at ¶ 49 *supra*. Ramon had been handling refill at Primo's request since October 2011. **Ex. 184**.

83.　In addition to notifying Ramon that Artesia's refill business was terminated, Primo decided to build a case against Ramon using its December 2013 year end results to put pressure on him. **Ex. 156**.

84.　The pressure did not work. Ramon told Primo that he was going to start keeping his own delivery records as he believed Primo's year end results were inaccurate. **Ex. 162-163**. One Primo employee internally noted that "we definitely have his attention" and another expressed concern "about what will get serviced by Rudy this month before we pull the plug." **Ex. 163, 161**.

85. Primo also decided to change its score card to "move" Ramon to seek early termination, as it had with 3B earlier in the year. See **Ex. 156** dated January 31, 2014. See also Tr. p. 734.

86. Despite Primo's management's belief that they had Ramon ready to quit (**Ex.165**) as of early February 2014, he did not.

87. In the spring of 2014, Primo radically changed its grading system for its remaining distributors, a change which insured lower scores by the remaining distributors. Tr. pp. 729-734; 747. In an internal email, Mark Zimora compared the scores for Artesia and HODE under the old and new scorecards based on May 2014 data. He pointed out that, if the new score card had been in place in May, Artesia and HODE would have scored 73% as opposed to the 100% plus that they in fact scored. **Ex. 264.**

88. Primo developed a distributor specific strategy for HODE as well. On June 6, 2014, despite regular scores in excess of 100% under the Primo scoring system in place for years, Primo wrote HODE and Cooke alleging "serious breaches" of the DA and cited HODE's use of the Primo name and certain trademarks. **Ex. 249.**

89. A few days later, both Ramon and Cooke received identical emails from Mark Zimora at Primo alleging poor scorecards and announcing the assignment of David Bunn to visit with each of them to assist in performance improvement. **Ex. 256, 257.**

90. Primo did not identify the customer employees expressing concerns and Ramon and Cooke took issue with the legitimacy of the scorecards and complaints. Ramon undertook his own customer survey (**See Ex. 262, 272**) which rebutted the reported performance problems.

91. On July 3, 2014, Bunn asked David Mills at Primo to review his report before he transmitted it to a larger group at Primo ("All") to be sure he wasn't "missing something." Among other things, Bunn reported that a new scorecard had been released in May and Primo was allowing the Texas group to "digest" the information prior to giving them a verbal notice with a deadline in place for service improvements. **Ex.273.**

92. Bunn's report, "a quick update on next steps for Texas," shows an intent to create a record of performance issues regarding Artesia and HODE in an effort to force them to early terminate or create a basis for terminating them for cause. Bunn provided a list of compliance issues with Artesia and HODE, and noted that "this is just a list of the higher level items we are

pursuing with Texas, there are also the daily communications and reminders of expectations they will receive **or feel bombarded by**." (emphasis added). **Ex. 273.** See Tr. pp. 1250-1251.

93.  Mr. Bunn was not a credible witness. Despite being assigned to "assist" HODE as well as Artesia, and repeatedly testifying that was his sole purpose (see e.g. Tr. p. 1194), Bunn eventually admitted that he never visited HODE at all and spent only a few hours at Artesia. Tr. p. 1254. His testimony was vague and lacking details that could easily be confirmed (or contradicted) from contemporaneous emails generated by more credible witnesses.[10]

94.  In his sworn testimony, Bunn denied urging Ramon to quit and repeatedly testified that his only objective was to "help" Mr. Ramon and Mr. Cooke. Tr. p. 1194. Mr. Bunn's testimony that his sole job was to "help" Artesia and HODE was belied by the evidence that Mr. Bunn was put in charge of the South Texas region to facilitate Primo's goal to "Drive RO Conversions, On-Time Territory Transitions," (**Ex. 233**) by "taking the territory from" Artesia and HODE. **Ex. 288.** See also **Ex. 300**, an internal Primo email referring to Bunn's Texas assignment to "help with Artesia, 3B and HODE **conversion**." (Emphasis supplied.) Tr. pp. 1271; 1275-1276

95.  In fact, according to Ramon, Bunn spent most of the time at Artesia urging Ramon to quit, not working with him collaboratively. Tr. p. 1254, 1531. And, Bunn finally admitted that he never made any effort to visit Mr. Cooke at all although he claimed that he visited HODE's "market" (**Ex. 273**) and, by his account, "spent considerable time" over a period of weeks in Mr. Cooke's "region." **Ex. 295.**

96.  As of July 12, 2014, Primo had still not achieved the 90% level under the DS Agreement, remained at risk for the imposition of penalties and was moving toward finding a way to terminate Artesia and HODE for cause. Mark Zimora in an internal Primo email of that same date noted that scorecard topics to be covered in internal Primo discussions included "legal notice to Artesia and HODE." **Ex. 284.**

97.  The importance of finding a way to terminate Artesia and HODE was discussed not only in internal Primo emails but also in internal emails

---

[10] For example, although he went to Texas one time, he could not recall which city he flew into. See Tr. pp. 1268-1269; 1340-1349. Although the whole point of this Texas visit was to investigate complaints against HODE and Artesia and to help them, he testified that he could not remember anything about the stores he visited or the employees he spoke to. Bunn Depo, p. 31. And, Bunn, while criticizing Artesia for being unable to deliver water due to a shortage of Primo bottles, could not recall if he ever investigated or responded to Ramon's accusation that Primo was supplying DS with bottles in south Texas while withholding them from Artesia. Tr. p. 1337.

produced by DS in this matter. On July 27, 2014, Ray McGillis of DS reported to Tom Harrington and other DS management on the "highly confidential Texas market" and reported that Mark Zimora of Primo had let him know that "they would be taking the territory from two of the Option 2 Regional Operators in September. My understanding is that this will be done through a legal notification.... I read into the conversation that there is a breach of contract involved with this proposed action." **Ex. 288.**

98. This evidence supports the conclusion that Primo gradually changed the conditions under which Cooke and Ramon operated in a concerted effort to get them to quit or, failing that, to provide a purported basis to terminate them for cause. Tr. pp. 782-784.

99. On August 1, 2014, David Bunn on behalf of Primo emailed Ramon. citing Zimora's email of June 11, 2014 and the new scorecard imposed by Primo. Bunn outlined problems in Ramon's territory and cited the loss of a WalMart store in Georgetown for which he blamed Ramon. **Ex. 294.**

100. Ramon undertook his own investigation into the allegations and rebutted Bunn's assertions in an email dated August 4, 2014. **Ex. 297.** He noted that the new scorecard was flawed and that he had undertaken his own research to develop the information to demonstrate that the conclusions were wrong. **Ex. 297.**

101. Ramon also pointed out that Primo controlled the delivery of equipment and bottles necessary to enable Artesia and others to perform their distribution obligations. **Ex. 297.** Ramon had learned through company drivers that when he could not get appropriate bottles, Primo was delivering bottles to DS. Ramon testified that his drivers were taunted by the DS drivers that they were going lose their jobs. Tr. PP. 115. **Ex. 297.**

102. Cooke's response to Bunn's August 1, 2014 email to HODE came on August 4, 2014. **Ex. 299.**

103. As discussed in Paragraph 8, *supra.*, on August 8, 2014, Artesia, HOD, and 3B, the Texas distributors sued DS and Primo in Texas state court for breach of contract among other things.

104. On September 5, 2014, Primo sent a letter purporting to terminate HODE's DA (**Ex. 322**) citing the August 1, 2014 "notice" (**Ex. 295**) and a follow up communication dated August 8, 2014. (**Ex. 305**). And on September 5, 2014, by separate letter, Primo purported to terminate HODE's Trademark License Agreement with Primo. **Ex. 323.**See also **Ex.420.**

105. Also on September 5, 2014, Primo sent a letter to Mr. Ramon purporting to terminate Artesia's DA (**Ex. 321)** citing the "notice" email by David Bunn of August 1, 2014 (**Ex. 294**) which was virtually identical to the "notice" sent to Mr. Cooke. **Ex. 295.**

106. DS, with Primo's consent, began servicing the territory previously assigned to Ramon and Cooke. Tr. p. 75. Neither Cooke nor Ramon were paid in accordance with the buyout provisions of their DAs. Tr. p. 80.

107. Ramon testified that the September 5, 2014 termination was financially devastating. Tr. pp. 81-83. He worked to mitigate his losses, including reaching out to Mark Castaneda, the CFO of Primo, in an attempt to arrange to sell certain assets to DS, the company which had taken over Ramon's territory. Tr.pp.83-88.

108. It is significant that the basis for Ramon's and Cooke's terminations relied on Primo's use of a distributor rating system that Primo unilaterally put into place in the spring of 2014, after Ramon and Cooke declined to accept the early termination option and declined to quit, as Tiger and others had, due to the significant price reduction.

109. With the termination of Artesia and HODE in September 2015, Primo achieved the 90% goal by October 2015 and was able to deliver the territories to DS well before the December 31, 2015 deadline and avoid significant financial penalties under the DS SA. Tr. p. 1093.[11]

## ANALYSIS OF CLAIMS AGAINST PRIMO

110. Artesia and HODE have each alleged that Primo breached their agreements, engaged in fraud, conspired with DS to commit fraud and violated NCGS 75-1.1, the North Carolina unfair and deceptive practice statute.

111. <u>Breach of Contract</u>. The purpose of breach of contract damages is to put an injured party in the same financial position it would have been in had the contract been performed –i.e., to give the party the benefit of its bargain. *See First Union Nat'l Bank v. Naylor*, 102 N.C. App. 719, 725 (1991) (citing Restatement (Second) of Contracts § 347 (1979)) ("The interest being protected by this general rule is the non-breaching party's 'expectation interest, and in so doing, the injured party receives the 'benefit of the bargain.'").

---

[11]Even so, according to Mr. Castaneda, Primo's CFO, the unexpected delay in transitioning distributors cost Primo around $700,000 in projected cost savings. Tr. pp. 1133-1135.

Case 1:17-cv-00304-CCE-JEP   Document 1-3   Filed 04/03/17   Page 17 of 32

112. An injured party's expectation interest is measured by the loss in the value to him of the other party's performance caused by its failure or deficiency. *Id.* In other words, "the measure of damages for the breach of a contract is the amount which would have been received if the contract had been performed as made, which means the value of the contract, including the profits and advantages which are its direct results and fruits." *Perkins v. Langdon,* 237 N.C. 159, 170 (1953); *see also Weyerhaeuser Co. v. Godwin Bldg. Supply Co.,* 292 N.C. 557, 560-61 (1977) (breach of contract damages are designed to compensate the injured party as if the contract had been fulfilled).

113. The evidence showed that Primo knew that it would be difficult if not impossible to meet its 90% conversion target unless it found a way to give Artesia's and HODE's territories to DS.

114. The Distribution Agreements granted Primo only two potential options for terminating Claimants: (a) for material breach of the agreements upon notice and following an opportunity to cure and (b) without cause by exercising a buy out option and paying an amount according to a formula contained in the DAs.

115. Primo and DS were aware of the availability of Primo's option to terminate without cause in that the DS Agreement stated at page five that Primo was not required to make payments under any "buy-out or similar provisions" in its DAs. Although such terminations without cause were available to Primo, Primo did not want to use the permitted contractual route because it was too expensive, according to Billy Prim. Tr. p. 1070-1071. ("we don't have that kind of money.")

116. When an insufficient number of distributors elected Option 1 described in paragraph 56 above and chose to keep their distribution rights, Primo elected to take distribution rights from Artesia and HODE so that it could give the South Texas territories to DS and reach its 90% goal. Primo did this under the pretext of a termination for cause when, in fact, Primo was actually terminating Artesia and HODE without cause and breaching its contractual obligation to pay the amounts required under the agreements.

117. We conclude that Primo's efforts to terminate for cause were improper and ineffective because the underlying bases for the purported terminations were "trumped up" and not credible. The August 1, 2014 emails sent to Artesia and HODE did not clearly state that any alleged breaches would be grounds for termination if not timely cured; we need not decide whether those emails

Case 1:17-cv-00304-CCE-JEP Document 1-3 Filed 04/03/17 Page 18 of 32

constitute sufficient notice because even if those emails do constitute sufficient notice, Artesia and HODE did not have a genuine opportunity to cure due to the trumped up nature of the complaints cited therein. Finally, it is clear that Primo's desire to terminate Artesia and HODE in order to reduce costs and avoid the financial penalties for failing to timely turn over 90% of the territories, overwhelmed Primo's ability to reasonably and in good faith consider any cure that Artesia and HODE provided in response to the August 1 emails; and, in fact, Primo did not reasonably and in good faith consider their responses.

118.   Following its improper terminations of Artesia and HODE, Primo awarded their territories to DS, thus enabling Primo to hit the 90% conversion target and achieve the financial incentive contained in the DS Agreement. As the CFO of Primo testified, this financial incentive as well as terminating the distributors as soon as possible permitted Primo to improve its margins significantly. Tr. p. 1135.

119.   Primo breached the DAs when it terminated Artesia and HODE *without cause* depriving them of the benefit of the full term of their bargained for exclusive distributorships. We next turn to the proper measure of damages for Primo's breach of the DAs.

120.   <u>Damages for Breach of Contract</u>. Breach of contract damages are designed to compensate the injured party as if the contract had been fulfilled.

121.   Respondents argue that it is not appropriate to use the contracted for measure in the event of an early termination because the provision applies only at Primo's sole option and it expressly and deliberately did not elect to formally exercise that "sole option." Stated differently, Primo argues that the Claimants' proper measure of damages for breach of contract would be lost profits, not the buyout formula that was an exclusive option of Primo's.

122.   We reject these arguments and conclude that the buyout formula in the DAs is an appropriate measure of damages for Primo's breach of contract for at least two reasons.

123.   First, Primo's conduct resulted in a *de facto* election by Primo to early terminate these two agreements. The agreements provided Primo only two ways to terminate the agreements prior to the end of the terms: with cause or by exercising the buyout option. Primo took the distribution rights from Artesia and HODE without cause and breached the agreements by failing to pay as required by the distribution agreements.

Case 1:17-cv-00304-CCE-JEP   Document 1-3   Filed 04/03/17   Page 19 of 32

124. Where, as here, one party has chosen to opportunistically and deliberately breach an agreement and take advantage of a promisee's vulnerability, that party is in no position to complain when the remedy imposed for that breach is based on a formula the breaching party drafted and agreed to.

125. Second, there is no question that the parties bargained for and agreed that the formula contained in the buyout provisions of the DAs was a proper measure of the value of the rights being taken from the distributors in the event of a termination without cause.

126. In sum, the Panel concludes that the proper remedy for Primo's refusal to pay for the distribution rights it took from Claimants is the amount agreed upon and intended by the parties to apply in the event the contract was terminated early without cause.

127. The Panel also concludes that Claimants' refill business revenues are properly included in this calculation, given the clear testimony by Claimants that it was their understanding that the refill business would be covered by their DAs and Primo's undisputed promise to them, following the execution of the DS SA, that the refill business would not be affected. The Panel also concludes that the use of $3.21 per bottle for Artesia and $3.13 per bottle for HODE is reasonable and appropriate. See Claimants' 2/14/17 brief at p. 9; Claimants' Request for Relief dated 12/20/16 and Exhibit 403. Claimants post hearing brief did not request a separate award for Primo's improperly cutting prices to the commercially unreasonable level of $2.59.

128. Artesia Contract Damages. Artesia contends that it is entitled to a total of $1,370,951 in damages for Primo's breach of contract. Artesia utilizes the process described in Par. 2(d) of Artesia's DA to determine the amount it would have been due if the agreement had been terminated without cause at Primo's election and includes the value of certain equipment retained by Primo. See Claimants' Post-hearing brief (2/14/17) at p. 9. The Panel agrees and hereby finds that **Artesia is entitled to $1,370,951** in damages for Primo's breach of contract.

129. HODE's Contract Damages. HODE contends that it is entitled to a total of $757,539 in damages for Primo's breach of contract which includes including $60,000 for a final payment withheld by Primo. HODE utilizes the process described in Par. 4 of HODE's DA to determine the amount it would have been due if the agreement had been terminated without cause at Primo's election, $697,539. See Claimants' Post-hearing brief (2/14/17) at p. 9. The Panel agrees and hereby finds that **HODE is entitled to $697,539**

Case 1:17-cv-00304-CCE-JEP   Document 1-3   Filed 04/03/17   Page 20 of 32

in damages for Primo's breach of contract. The Panel does not find a sufficient basis to award the additional $60,000 requested by HODE.

130. <u>Interest.</u> Claimants correctly contend that they are entitled to statutory interest of 8% on the contract damages from the date of breach of the DAs until the date of the award pursuant to NCGS 24-1 and 24-5. The Panel agrees.

131. While there were multiple breaches here over a period of time, Claimants only seek a remedy for the primary breach in each case, the improper termination that was effective September 5, 2014. See **Exs. 320, 321, 420.**

132. Accordingly, the Panel finds that Artesia is entitled to **$278,845.44** in statutory interest and that HODE is entitled to **$141,501.44** in statutory interest which represents 8% interest from September 5, 2014 to March 20, 2017 on Artesia's primary award of $1,370,951 and on HODE's primary award of $697,539. This represents daily interest in the amount of **$300.48** for Artesia and **$152.89** for HODE. Interest shall continue to accrue on each award subsequent to March 20, 2017 at the daily rate until the Awards are paid in full.

133. <u>Fraud.</u> In North Carolina, in order to prove fraud, Claimants must show: (1) that Respondents made a representation relating to some material past or existing fact; (2) that the representation was false; (3) that Respondents knew the representation was false when it was made or made it recklessly without any knowledge of its truth and as a positive assertion; (4) that Respondents made the false representation with the intention that it should be relied upon by Claimants; (5) that Claimants reasonably relied upon the representation and acted upon it; and (6) that Claimants suffered injury. *Johnson v. Phoenix Mut. Life Ins. Co.*, 300 N.C. 247, 253 (1980). The elements for actionable fraud in Texas are similar. *Broussard v. Meineke Discount Muffler Shops*, 945 F. Supp. 901, 912 (W.D.N.C. 1996) (citing *Carnival Leisure Indus., v. Aubin*, 53 F.3d 716, 718 (5th Cir. 1995)).

134. A representation on which a fraud claim rests must be "definite and specific" and involve "[a] subsisting or ascertainable fact, as distinguished from a matter of opinion or representation relating to future prospects." *Ragsdale v. Kennedy*, 286 N.C. 130, 139 (1974).

135. "It is not sufficient that the representation be false in point of fact...The party making a representation must know or believe it to be false" as well. *Tarault v. Seip*, 158 N.C. 363, 370 (1912) (an essential element of

Case 1:17-cv-00304-CCE-JEP   Document 1-3   Filed 04/03/17   Page 21 of 32

actionable fraud is the scienter knowledge of the wrong; in other words, fraud cannot exist where the intent to deceive does not exist).

136. While there is little doubt that Primo misled Claimants by its pretextual termination of their contracts, as described above, that does not mean that Primo committed fraud.

137. Some of the requisite elements of fraud are missing here. Specifically, there is no evidence that Respondent Primo's promise that it would in future follow the trailing 12 formula and the contractual buy out provisions should it choose to terminate Claimants without cause, was false at the time when made. Moreover, there is no evidence that Primo lacked intent to perform the promises it made at the time Claimants became distributors for Primo. *Ragsdale, supra.* Accordingly, Claimants' claims for fraud must both fail.

138. <u>Conspiracy to commit fraud</u>. Civil conspiracy requires a showing of an overt act committed by one or more conspirators pursuant to a common agreement and in furtherance of the common objective to commit an unlawful act. *Shope v. Boyer*, 268 N.C. 401, 405 (1966). Absent an "unlawful act" (here, the alleged fraud), there can be no conspiracy. *See id.* In addition, the evidence of the agreement to commit the unlawful act must be sufficient to create "more than a suspicion or conjecture to justify submission to a jury." *Henderson v. LeBauer*, 101 N.C. App. 255, 261 (1991).

139. In light of the finding above that Primo did not engage in fraud and the finding below that DS made no representation to Claimants actionable as fraud, there is no basis to find that Primo engaged in conspiracy to commit fraud.

140. <u>NCGS 75-1.1</u>. We must now consider whether Primo's conduct rises to the level of a violation of NCGS 75-1.1. Actions for unfair or deceptive trade practices are distinct from actions for breach of contract, *Lapierre v. Samco Dev. Corp.*, 103 N.C. App. 551, 559 (1991). A mere breach of contract, even if intentional, is not sufficiently unfair or deceptive to sustain an action under N.C. Gen. Stat. § 75-1.1. *Mosley & Mosley Builders, Inc. v. Landin, Ltd.*, 97 N.C. App. 511, 518 (1990); *Bartolomeo v. S.B. Thomas, Inc.*, 889 F.2d 530, 535 (4th Cir. 1989).

141. To recover under NCGS 75-1.1 here, in the absence of proof of fraud or other tortious conduct, Claimants must show substantial aggravating circumstances attending the breach. *Bartolomeo*, 889 F.2d at 535; *see also United Roasters, Inc. v. Colgate-Palmolive Co.*, 649 F.2d 985, 992 (4th Cir. 1981) ("In a sense, unfairness inheres in every breach of contract when one

of the contracting parties is denied the advantage for which he contracted, but this is why remedial damages are awarded on contract claims. If such an award is to be trebled, the North Carolina legislature must have intended that substantial aggravating circumstances be present.").

142. In a contract case, "substantial aggravating circumstances are found most often when the defendant has deceived the plaintiff in connection with the formation or the breach of the contract." Sawchak 90 North Carolina Law Review 2033 at 2048-2050 (2012).

143. The use of a pretextual reason for terminating a contract has been held to constitute a sufficient aggravating circumstance to conclude that NCGS75-1.1 has been violated. *See Johnson v. Colonial Life & Acc. Ins. Co.,* 618S.E.2d 867, 871 (N.C. App. 2005) ("[The plaintiff] presented evidence that false accusations were deceptively made against him as pre-text forming the basis of termination and the jury agreed. Therefore, where the jury found that there was a breach of contract accompanied by aggravating factors, it was proper for the judge to conclude as a matter of law that a claim under[the UDTPA] had been satisfied."); *Martin v. Bimbo Foods Bakeries Distribution, Inc.,* No.5:14-CV-17-BR, 2014 WL 3487618, at *4 (E.D.N.C. 2014) ("In this case, plaintiff is claiming that not only did defendant terminate their agreement contrary to its terms but also defendant acted unfairly and deceptively by pretextually terminating the agreement. Under *Johnson,* that pretextual termination may constitute a substantial aggravating circumstance attendant to the breach of contract. Therefore, the court concludes that plaintiff has sufficiently alleged a UDTPA claim.").

144. Here, Primo terminated Claimants utilizing pretextual reasons as the basis for a termination for cause. As described above, Primo had no good faith basis to terminate for cause and plainly intended to find a way to eliminate Claimants as distributors when it became apparent that Primo would not hit the 90% goal of the DS Agreement without the termination of Claimants. These unfair and deceptive actions caused injury to Claimants. However, Claimants made no separate showing of damages, such as lost profits, arising from the unfair and deceptive acts.

145. NCGS 75-16.1 provides: If any person shall be injured or the business of any person, firm or corporation shall be broken up, destroyed or injured by reason of any act or thing done by any other person, firm or corporation in violation of the provisions of this Chapter, such person, firm or corporation so injured shall have a right of action on account of such injury done, and **if damages are assessed in such case judgment shall be rendered in favor**

**of the plaintiff and against the defendant for treble the amount fixed by the verdict.** (Emphasis supplied). The Panel is unable to determine the damages from the unfair and deceptive practices and therefore no trebling of such damages can be awarded.

146. <u>Attorneys' Fees and Expenses</u>. As discussed in paragraphs 15-16 above, the parties' agreements were amended and reaffirmed subsequent to October 1, 2011, the effective date of the NCGS 6-21.6 which provides for the enforceability of business contracts containing reciprocal agreements to pay attorneys' fees. The panel was unaware of these amendments at the time it considered the attorneys' fee issue on Respondents' motions for summary judgment. Having considered all the evidence with regard to the parties' contractual relationship, we conclude that the attorneys' fees provisions contained therein are enforceable.

147. The DAs provide: "the prevailing party in any arbitration shall be entitled to recover from the other party or parties, the costs and expenses of maintaining such arbitration, including reasonable attorneys' fees and costs incurred before such arbitration is commenced, during arbitration and on appeal." See **Ex. 34** at par. 21; **Ex. 41** at par. 14.

148. Claimants jointly seek the recovery of a total of $1,139,135 in expenses and fees, consisting of $820,733 in fees and $290,402 in expenses. This includes expert fees of $88,000 and $105,829.19 in arbitrator compensation and AAA filing fees. See Exhibit K to Claimants' Post-Hearing Brief, and related exhibits.

149. Aside from Primo's primary arguments against an award of attorneys' fees, which the panel has already rejected, Primo questions Claimants' assertions that they have properly excluded expenses and fees relating to BBB (3B) which is no longer a party to this matter and those fees and expenses relating to the defense of HODE regarding Primo's trademark and related claims. See Respondents' Post-Hearing Response (2/24/17) p. 37 footnote 21. There, Primo simply makes "note" of these points but offers no facts supporting their "note." The Panel concludes that the evidence presented by Claimants' counsel on these two points is persuasive.

150. Accordingly, the Panel concludes that Primo should pay Claimants' fees and expenses in the amount of **$1,033,306.** This represents the full amount of fees and expenses sought by Claimants under the contract, less $105,829.19 in arbitrator compensation and AAA filing fees which will be dealt with separately below.

151. Since the Panel has concluded that Claimants are entitled to attorneys' fees and expenses based on the contracts, the Panel does not reach the question of the propriety of an award of such fees and expenses under NCGS 75-16.1.

## CLAIMS AGAINST DS

152. Claimants contend that DS tortiously interfered with their prospective business advantage, and their contracts, engaged in fraud and conspiracy to commit fraud and violated NCGS 75-1.1. Each of these claims against DS suffer from key defects

153. <u>Tortious interference</u>. A cause of action for tortious interference with contract requires proof of the following elements: "(1) a valid contract between the plaintiff and a third person which confers upon the plaintiff a contractual right against a third person; (2) the defendant knows of the contract; (3) the defendant intentionally induces the third person not to perform the contract; (4) and in doing so acts without justification; (5) resulting in actual damage to plaintiff." *Beck v. City of Durham*, 154 N.C. App. 221, 232 (2002) (citing *United Labs., Inc. v. Kuykendall*, 322 N.C. 643, 661 (1988)). Interference with a contract is "justified if it is motivated by a legitimate business purpose, as when the plaintiff and the defendant, an outsider, are competitors." *Embree Constr. Grp., Inc. v. Rafcor, Inc.*, 330 N.C. 487, 498 (1992).

154. Indeed, a party may even encourage the termination of a contract "if he does so for a reason reasonably related to a legitimate business interest." *Robinson, Bradshaw & Hinson, P.A. v. Smith*, 129 N.C. App. 305, 318 (1998) (quoting *Fitzgerald v. Wolf*, 40 N.C. App. 197, 200 (1979)). "[C]ompetition in business constitutes justifiable interference in another's business relations and is not actionable so long as it is carried on in furtherance of one's own interests and by means that are lawful." *Peoples Sec. Life Ins. Co. v. Hooks*, 322 N.C. 216, 220-21 (1988).

155. Claimants also claim that DS interfered with their prospective business relationships. *See* Third Am. Demand for Arbitration ¶ 19. This tort arises when a party interferes with a business relationship "by maliciously inducing a person not to enter into a contract with a third person, which he would have entered into but for the interference, ...if damage proximately ensues, when this interference is done not in the legitimate exercise of the interfering person's rights." *Spartan Equip. Co. v. Air Placement Equip. Co.*, 263 N.C. 549, 559 (1965). However, a plaintiff's mere expectation of a

Case 1:17-cv-00304-CCE-JEP   Document 1-3   Filed 04/03/17   Page 25 of 32

continuing business relationship is insufficient to establish such a claim. *Dalton v. Camp*, 353 N.C. 647, 655 (2001).

156. DS's agreement with Primo expressly confirmed that Primo was not required to early terminate or breach its distribution agreements although Primo was provided a specific economic incentive for turning over territories to DS within certain time frames. See Exhibit 104, page 5.

157. Essentially, DS offered to take over Claimants' territory at a lower price at the termination of Claimants' agreements, which is fair competition.

158. The Panel concludes that DS likewise prevails on the claims of fraud and conspiracy to commit fraud. DS never made representations to either Claimant that could form the basis for a claim of fraud. Accordingly, Claimants should recover nothing on their claims against DS.

159. Fees. and Expenses. Since Claimants are entitled to no relief against DS, DS is not obligated to pay any of Claimants fees and expenses.

## COUNTERCLAIMS AGAINST ARTESIA

160. In light of the analysis above, the Panel concludes that Artesia did not breach its agreements with Primo. Primo shall recover nothing on its first claim for relief against Artesia for breach of contract.

## CLAIMS AGAINST HODE AND COOKE

161. Primo has alleged counterclaims against HODE for breach of its DA, misappropriation, conversion, unfair competition, trademark infringement and cybersquatting. It also alleges that John Cooke is personally and derivatively liable on the same claims.

162. Breach of Contract. As to the second and third claims for relief for breach of contract against HODE and Cooke, in light of the analysis above, the Panel concludes that neither HODE nor Cooke are liable to Primo for breach of the HODE DA and Primo shall recover nothing on its breach of contract claims for relief.

163. Unfair Competition under state law. In its fourth claim for relief, Primo alleges that HODE and Cooke have violated common law and the unfair competition statutes of both Texas and North Carolina. Unfair competition may occur when a party without authorization adopts for his own goods, a sign or symbol of another's that would likely mislead prospective purchasers and the public as to the identity of the goods. *Yellow Cab Co. v. Creasman*,

185 N.C.551, 554 (1923). Unfair competition by a defendant is actionable when it damages a plaintiff's legitimate business. ***Polo Fashions, Inc. v. Gordon Grp.***, 627 F. Supp. 878, 891 (M.D.N.C. 1985).

164. As with North Carolina common law, an unfair competition action under Texas common law presents essentially no difference in issues than those under federal trademark infringement actions. *See **Horseshoe Bay Resort Sales Co. v. Lake Lyndon B. Johnson Improvement Corp.***, 53 S.W.3d 799, 806 n.3 (Tex. App. Austin 2001).

165. To state a claim for unfair competition and unfair and deceptive trade practices under NCGS 75-1.1, a plaintiff must establish that (1) the defendants "committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff." ***Dalton,***353 N.C. at 656. Acts of trademark infringement are *per se* unfair and deceptive trade practices. ***Ray Lackey Enters., Inc. v. Vill. Inn Lakeside, Inc.***, 2016 NCBC 9, 61 (N.C. Super. Ct. 2016).

166. <u>Lanham Act</u>. As to Primo's fifth claim for relief, the Lanham Act prohibits a party from using in commerce without the consent of the registrant "any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive." **15 U.S.C. § 1114.**

167. In order to prevail on a cause of action for trademark infringement under the Lanham Act, the trademark holder must show (1) that it owns a trademark and (2) that the infringer used the mark without authorization in commerce and in a manner likely to create consumer confusion. *See id.; see also **Microsoft Corp. v. Computer Serv. & Repair, Inc.***, 312 F. Supp. 2d 779, 784 (E.D.N.C. 2004).

168. Though proof of actual confusion is not required to succeed on a claim under the Lanham Act, Primo contends that customers were, in fact, confused. *See **George & Co.***, 575 F.3d at 398; *see also **Lone Star Steakhouse & Saloon v. Alpha of Va., Inc.***, 43 F.3d 922, 937 (4th Cir. 1995) (noting that actual confusion "provides the most compelling evidence of likelihood of confusion").

169. Primo's fourth and fifth claims hinge on a conclusion that the Trademark License Agreement between HODE and Primo ("TM Agreement," see **Ex. 67**) dated May 14, 2011 (and which Primo purported to terminate effective

Case 1:17-cv-00304-CCE-JEP   Document 1-3   Filed 04/03/17   Page 27 of 32

September 5, 2014, see **Ex. 323**) does not protect HODE and Cooke from their claims. We disagree.

170. The TM Agreement was designed to permit HODE to utilize the Primo brand and trademark in the home and office water delivery business, a business that Primo was not engaged in, within the same territory covered by HODE's DA. (See **Ex. 67** at p.1 "HOD Enterprises desires to acquire a license to use the Primo Trademarks.... in the HOD Business..."; and Paragraph 1 (a) which defines the HOD Business as the "business of selling Products to home and office customers for their respective personal consumption and not for resale."). Tr. p. 306-308; 317-318; 331-334.

171. The TM Agreement was subject to extensive negotiation between Cooke and Mick Gunter, a vice president at Primo. Tr. pp. 306-346. Primo contends that following the departure of Mick Gunter from Primo, no one at Primo was aware of the TM Agreement. This may be. However, the evidence shows that Gunter was authorized to execute the TM Agreement. Tr. pp. 335-337; 345-346. Further, Primo personnel were aware of HODE's use of its brand and mark for this purpose and did not question its use until Primo decided to terminate HODE's DA in order to give its territory to DS. Tr. P. 340-347; 1322-1325.

172. Primo also contends that the TM Agreement does not protect HODE here because the royalty price remained to be negotiated and that, it contends, makes the agreement unenforceable. However, HODE seeks to use the agreement here as a defense against Primo's claim of trademark infringement and unfair competition and does not seek to use the agreement affirmatively to recover damages.

173. The Panel concludes that the agreement, as executed, is sufficiently specific and enforceable to make clear that it was intended to expressly authorize HODE and Cooke to do what they did with regard to the Primo brand and trademark. Moreover, regardless of the enforceability of the agreement, Primo is, under the circumstances here, estopped to claim that HODE's use was unauthorized, and HODE may properly rely on the agreement to defend itself against Primo's claim. Accordingly, the Panel concludes that Primo is not entitled to recover on its fourth or fifth claims for relief.

174. <u>Anti-cybersquatting</u>. In its sixth claim for relief, Primo contends that HODE and Cooke have violated the federal Anti-cybersquatting Consumer Protection Act ("ACPA"), **15 U.S.C. § 1125(d)**. It provides protection against the "deliberate, bad-faith, and abusive registration of Internet domain

names in violation of the rights of trademark owners." ***Virtual Works, Inc. v. Volkswagen of Am., Inc.***, 238 F.3d 264, 267 (4th Cir. 2001) (quoting S. Rep. No. 106-140, at 4 (1999)). A defendant is liable under the ACPA when (1) a plaintiff's trademark is a distinctive or famous mark entitled to protection, (2) the defendant's domain name is identical or confusingly similar to the plaintiff's mark, and (3) the defendant registers, traffics in, or uses a domain name with the bad faith intent to profit from it. **15 U.S.C. § 1125(d)**(1999); ***Hanley-Wood LLC v. Hanley Wood LLC***, 783 F. Supp. 2d 147, 152 (D.D.C. 2011).

175. In determining whether the defendant registers, traffics in, or uses domain names with a bad faith intent, a court may consider the following nine factors: (1) any legitimate trademark rights of the defendant in the domain names; (2) the extent to which the domain names are the defendant's legal name or are commonly used to identify the defendant; (3) whether the defendant had a prior bona fide use of the domain names in connection with goods or services; (4) if the defendant's use of the mark is noncommercial or fair use; (5) the defendant's intent to divert consumers from the trademark owner's online location to a site accessible under the domain names that could harm the goodwill of the mark, either for commercial gain or with the intent to tarnish or disparage the mark by creating a likelihood of consumer confusion as to the source, sponsorship, affiliation, or endorsement of the website; (6) whether the defendant offered to transfer or sell the domain names for financial gain without intending to use the domain names to offer any goods or services; (7) whether the defendant provided material and misleading false contact information when applying for registration of the domain names; (8) the defendant's registration of multiple domain names that he knows are identical or confusingly similar to the distinctive marks of others; and (9) the extent to which the mark incorporated in the domain names is distinctive or famous. **15 U.S.C. § 1125(d)(1)(B)(i)**. These factors are nonexclusive. *See, e.g., **Citigroup, Inc. v. Chen Bao Shui***, 611 F. Supp. 2d 507, 510 (E.D. Va. 2009).

176. The Panel concludes that Primo's claim fails for several reasons. First, Respondents concede that Factors Six and Seven are not met in the present case because, neither HODE nor Cooke offered to sell or transfer the domain names, and there is no evidence that Cooke registered the domain names or supplied false contact information in connection with such registration.

177. Next, there is no doubt that Primo authorized HODE and Cooke to use its names and marks pursuant to the TM Agreement. Moreover, Primo was not itself in the home and office water delivery business and Primo concedes

that Primo did not lose any customers as a result of use of the domain name which HODE believed it was authorized to use. See Respondents' Post Hearing brief (2/14/17) at p. 14. Indeed, Primo describes the complaining customers as being "irritated" not confused. Id. at p. 15. Simply put, Primo presented no evidence of customer confusion.

178. Further, it is clear that during much of the period, Cooke reasonably believed that his use was permitted and Cooke's testimony about his intent to wind down the use of the domain name once Primo complained is credible. Primo complains that he failed to cause that transition to his own domain name to occur as quickly or efficiently as Primo thinks it should have but this does not create the bad intent to profit that is required to demonstrate that the statute has been violated.

179. Finally, the correspondence and the timing of Primo's complaints supports the view that Primo's complaints about Cooke's use of its marks and domain names was part of its effort to pressure him to early terminate his DA. See, e.g., **Ex. 249** dated June 6, 2014 in which Primo first raised its complaints about Cooke's use. See also discussion at ¶ 88, *supra*.

180. In short, we find no evidence that Cooke and HODE possessed the bad intent to profit that is required to find a violation of this statute.

181. Accordingly, the Panel concludes that Primo shall recover nothing on its sixth claim for relief for cybersquatting against HODE and Cooke.

**The Panel, therefore, AWARDS as follows:**

I.  Primo shall pay to Artesia the following:

    a. $1,370,951 for Primo's breach of contract

    b. $278,845.44 in interest from September 5, 2014 to March 20, 2017; interest shall continue to accumulate after March 20, 2017 at the daily rate of $300.48 until the award is paid.

II.  Primo shall pay to HODE the following:

    a. $697,539 for Primo's breach of contract

    b. $141,501.44 in interest from September 5, 2014 to March 20, 2017; interest shall continue to accumulate after March 20, 2017 at the daily rate of $152.89 until the award is paid

III.  Primo shall also pay to Artesia and HODE jointly the sum of $1,033,306.00 in attorneys' fees and litigation costs.

IV.  In addition, Primo shall bear the administrative fees and expenses of the American Arbitration Association totaling $22,200 and shall bear the Arbitrators compensation totaling $212,860.88 and expenses totaling $7,942.38. Primo shall reimburse Artesia the sum of $53,215.22 for Arbitrators compensation and shall reimburse HOD and Cooke the amount of $53,215.22 for Arbitrators compensation. Primo shall reimburse Artesia and HODE and Cooke for Arbitrator expenses in the amount of $3,971.19.

V.  Artesia and HODE shall have and recover nothing of DS; and Primo shall have and recover nothing of Artesia, HODE or Cooke.

VI.  The sums awarded herein shall be paid within thirty (30) days after the date of this Award and as noted above shall continue to accumulate interest on a daily basis as described above until fully paid.

VII.  This Award is in full settlement of all claims and counterclaims submitted to this Arbitration. All claims not expressly granted herein are hereby denied.

    This Award may be executed in any number of counterparts, each of which shall be deemed an original, and all of which shall constitute together one and the same instrument.

_March 20, 2017_
Date

_March 20, 2017_
Date

_March 20, 2017_
Date

Chair, Catharine Biggs Arrowood

John T. Blankenship

Henry L. Parr, Jr.